[No. 10790-6-III.  Division Three.  July 7, 1992.]

STEPHEN D. PELTON, ET AL, *Appellants,* v. TRI-STATE MEMORIAL HOSPITAL, INC., ET AL, *Respondents.*

*Eugene G. Schuster* and *Critchlow, Williams, Schuster, Malone & Skawbania* (*Danny Radakovich,* of counsel), for appellants.

*David A. Gittins* and *Little, Pike & Gittins; Dan W. Keefe, Christopher J. Kerley,* and *Keefe, King & Bowman; William D. Symmes, Brian T. Rekofke,* and *Witherspoon, Kelley, Davenport & Toole, P.S.,* for respondents.

MUNSON, J. — In this medical negligence action alleging injuries caused by birth trauma, the trial court granted the doctors' and hospital's joint motion for summary judgment of dismissal, finding the Peltons failed to meet their burden of raising a genuine causation issue based on reasonable medical certainty. The Peltons appeal; we affirm.

Following a normal pregnancy attended by George D. Oh, M.D., and John S. Dunlop, M.D., Charlene Pelton entered Tri-State Memorial Hospital on October 13, 1983. Dr. Dunlop attempted vaginal delivery assisted by forceps; Tammy Pelton was subsequently delivered by caesarean section.

In December 1984, Tammy experienced seizures and was examined by Dr. James Stockard, a neurologist. Since then, Tammy has evidenced neurological and mental deficits, partial loss of motor function, and a seizure disorder.

In 1985, the Peltons filed a negligence action against the hospital, the attending physician, Dr. Dunlop, and his partner, Dr. Oh. Dr. Oh was later dismissed from the action except for potential derivative liability. The Peltons alleged

the injuries were caused by perinatal trauma at the hospital.

Trial was set for March 26, 1990. On September 21, 1989, a magnetic resonance imaging (MRI) scan was conducted on Tammy and interpreted by Dr. Zobell, who concluded the scan disclosed no brain damage attributable to birth trauma. A copy of the report was sent to Tammy's counsel. By November 1, 1989, the doctors and the hospital identified their expert witnesses as Drs. Royce L. Zobell (neuroradiologist), John H. Menkes (pediatric neurologist), Zane Brown (perinatologist) and Roberta A. Pagon (medical geneticist).

On December 28, 1989, Dr. Menkes examined Tammy and drew her blood in the presence of her father. The blood sample was tested by the Sacred Heart Medical Center (SHMC) cytogenetic laboratory, and the January 11, 1990, report disclosed a chromosomal defect 9p22:[1]

> A deletion of the terminal portion of one chromosome 9 is present in all cells analyzed. The break point appears to be at or near band 9p22. . . . [A]pproximately one-third of cases result from a parental translocation; cytogenetic analysis of the parents should therefore be considered.

Based on the clinical examination and the cytogenetic report, Dr. Menkes concluded Tammy's deficits were *totally* caused by chromosome anomaly occurring *at conception* and not by any conduct of the health care providers. A copy of this report was sent to Tammy's physician, Dr. Stockard, who discussed the genetic material with Tammy's parents and counsel on January 15, 1990.

On February 13, Drs. Dunlop and Oh and Tri-State Hospital jointly moved for summary judgment. The motion was supported by declarations of their four medical experts. On February 21, the Peltons moved to vacate the hearing and trial date, extend discovery and name additional experts. At the February 27 hearing on the motion, the Peltons stated they needed more time to respond to the

---

[1]"9p22" means all of the short arm, the material distal from the point 22 to the end of the chromosome, is gone.

recently developed genetic theory; to complete interpretation of the February 20 Oregon Health Sciences University (OHSU) test they had requested; to locate experts; and to make further discovery. Defense counsel notified the court that Dr. Pagon, head of the Children's Hospital and Medical Center Regional Genetics Clinic in Seattle since 1979, would examine Tammy on March 1 and draw another blood sample for tests by the University of Washington (UW). The motion was granted and the hearing on summary judgment was reset for March 22.

OHSU's March 7 report stated that all cells examined had

a terminal deletion of a chromosome 9 short arm. The deleted portion appears to include most of band 23 to the terminal end of the short arm. However, another possible interpretation is that there is an interstitial deletion of the short arm between p22.1 and p24.1.

Recommend chromosome studies of both parents to rule out balanced translocation carrier status, assess potential risk for other family members and to possibly aid in more precise definition of breakpoints.

On March 1, Dr. Pagon examined Tammy and drew blood for UW testing. Based on the clinical examination, she concluded Tammy's neurological and mental deficits were "definitely not" caused by care during the perinatal period and were consistent with the deletion 9p syndrome. Reviewing the SHMC and OHSU cytogenetic reports, she concluded the reports reached the same results and confirmed Tammy's chromosomal abnormality as the source of her defects.

The Peltons deposed Dr. Pagon on March 2 and Dr. Menkes on March 5. On March 15, the Peltons requested a second continuance of the summary judgment hearing, contending they needed a blood test by the Mayo Clinic to resolve inconsistencies between the SHMC and OHSU tests; to examine the UW test results, not yet received, and identify responsive witnesses; to determine whether Tammy has cerebral palsy in light of recent comments by Markus Lefkovits, an examining psychologist; and to place the recent but not yet transcribed depositions of Drs. Pagon and Menkes before this court.

The doctors and the hospital submitted the supplemental declarations of Drs. Pagon and Menkes, which stated the SHMC, OHSU and UW cytogenetic reports were consistent and confirmed the genetic causation of Tammy's deficits.

After a hearing on March 22, the court found the three cytogenetic test results were consistent; the Mayo Clinic test would be similar to tests already performed; and the Peltons had failed to show additional testing would contradict evidence already obtained. The Peltons' motion was denied. The court also found the defendants met their burden by providing expert testimony establishing the genetic causation of Tammy's deficits, but the Peltons did not meet their burden of showing a genuine issue of material fact based on reasonable medical certainty by competent evidence. The court, therefore, entered an order for summary judgment of dismissal.

The Peltons appeal, contending the trial court erred by granting the summary judgment and refusing to delay the summary judgment hearing to allow additional time for discovery.

■ In reviewing a summary judgment, the appellate court engages in the same inquiry as the trial court. *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990). A motion for summary judgment will be sustained only if there is no genuine issue of material fact, viewing the evidence in the light most favorable to the nonmoving party. *Marincovich*, at 274.

■ ■ In a medical negligence action, the defendant may move for summary judgment based on absence of competent medical evidence to make out a prima facie case. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989). Once the moving party has shown the absence of a genuine issue of material fact, the burden shifts to the nonmoving party, who must make out a prima facie case of all essential elements. *Young*, at 225-26. This evidence is sufficient if it supports a "reasonable inference" of all the elements. *See Van Hook v. Anderson*, 64 Wn. App. 353, 358, 824 P.2d 509 (1992). Generally, a "reasonable inference" is

founded on expert medical testimony rising to the level of reasonable medical certainty. *See McLaughlin v. Cooke*, 112 Wn.2d 829, 836-37, 774 P.2d 1171 (1989). Here, the causation issue is so technical that reliance on lay opinion would be unreasonable. Moreover, in light of the purpose of a summary judgment, which is to avoid unnecessary trials where insufficient evidence exists, *Young*, at 226, the Peltons' opposition to summary judgment cannot succeed based on mere speculation or "possibility".

The doctors and hospital support their motion with declarations of Dr. Pagon, a specialist in medical genetics, author of over 40 publications, and medical school faculty member; and Dr. Menkes, a specialist in pediatric neurology, professor emeritus of neurology and pediatrics at the University of California, Los Angeles, and author of hundreds of articles on child neurology. Dr. Pagon, who reviewed the three cytogenetics tests, and Dr. Menkes, who reviewed the SHMC and OHSU tests, stated the cytogenetics tests were consistent; were confirmatory of total chromosomal causation of Tammy's deficits; and gave detailed explanations of their separate clinical reasons for reaching this conclusion. The declaration of Dr. Brown, a specialist in high risk maternal-fetal medicine, stated that, after reviewing the perinatal records and the SHMC cytogenetic report, based on reasonable medical certainty, Tammy's deficits were not the result of perinatal care. The Peltons' experts all deferred entirely to the defense experts on the causation issue. Dr. Stockard, Tammy's treating neurologist, admitted his 1984 diagnosis of birth trauma as the cause of her condition was speculative in retrospect. Dr. Zobell stated the MRI scan revealed no evidence of brain damage resulting from the labor or delivery (perinatal) period. This was sufficient to show an absence of genuine issues requiring a trial. The burden then shifted to the Peltons.

The Peltons failed to present a single expert who could testify, based on reasonable medical certainty, that birth trauma contributed to Tammy's condition. The hearsay statements regarding a possible cerebral palsy diagnosis is

inadmissible for purposes of deciding a summary judgment motion. *See Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 644, 618 P.2d 96 (1980). The information from the Mayo Clinic, resulting from a telephone conversation with the Peltons' counsel as stated in his affidavit, is inadmissible. *Meadows v. Grant's Auto Brokers, Inc.*, 71 Wn.2d 874, 431 P.2d 216 (1967). The trial court did not err in granting summary judgment based on the record before it.

The Peltons nonetheless contend the denial of their motion for a second continuance was reversible error.

■ Although a continuance of a summary judgment hearing is available under CR 56(f) to permit further discovery, denial is proper when

> (1) the requesting party does not offer a good reason for the delay in obtaining the desired evidence; (2) the requesting party does not state what evidence would be established through the additional discovery; or (3) the desired evidence will not raise a genuine issue of material fact.

*Turner v. Kohler*, 54 Wn. App. 688, 693, 775 P.2d 474 (1989). Denial is proper if grounded on any *one* of the *Kohler* prongs.

The SHMC test report and the OHSU test report were available on January 15 and March 7, 1990, respectively. The first continuance was granted, in part, for the purpose of interpreting these tests. The Peltons do not explain their failure to interpret these tests. Therefore, their request for a delay to interpret a third (UW) similar test[2] is not persuasive, particularly in light of their own experts' deferrals to Drs. Pagon and Menkes on the causation issue. The Peltons offer no reason for the delay in performing a fourth similar test at the Mayo Clinic. Blood testing of the parents, one of the reasons given for seeking the second continuance, had

---

[2]In her March 21, 1990, supplemental declaration, Dr. Pagon stated the OHSU report in "all essential parts . . . reaches absolutely the same results as the Sacred Heart study." In his March 16, 1990, supplemental declaration, Dr. Menkes stated "there is not any significant difference between these two reports."

been repeatedly suggested to the Peltons at least as early as January 15 in the SHMC report. The Peltons offer no explanation for the failure to test the parents during the 2 months prior to the second motion for continuance. Finally, the Peltons' affidavits indicate on January 25 or 26, 1990, a psychologist suggested a cerebral palsy diagnosis. The Peltons have failed to explain the absence of any previous attempt to investigate this diagnosis.

The Peltons have failed to offer a good reason for the delay in obtaining the desired evidence. This is a sufficient basis under *Kohler*, at 693, for denying a continuance.

Moreover, although the Peltons did state what evidence they believed would be established through the additional disclosure, they fail to explain the materiality of such evidence to the causation issue. Such an explanation is required in light of the statements by two well qualified experts that the SHMC and OHSU test results were consistent, confirmed the chromosomal causation of Tammy's deficits, and ruled out perinatal trauma as the cause of the deficits. The expert who compared all three cytogenetics tests found all were consistent and confirmatory.

The trial court did not abuse its discretion in denying the Peltons a second continuance when no good reason for the delay was given and the desired evidence appears to be cumulative or immaterial. After review of the entire record, the sole reasonable conclusion is Tammy's deficits were caused entirely by genetic abnormality.

The summary judgment in favor of Drs. Oh and Dunlop and Tri-State Hospital is affirmed.

SHIELDS, C.J., and SWEENEY, J., concur.